**NOT FOR PUBLICATION**

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

| | |
|---|---|
| In re: ) | BAP No.   CC-13-1311-KuDaKi |
| ) | |
| FLASHCOM, INC.,                    ) | Bk. No.   12-16351 |
| ) | |
| Debtor.   ) | Adv. No.   12-01339 |
| _____ ) | |
| ) | |
| CAROLYN A. DYE, Liquidating    ) | |
| Trustee,                       ) | |
| ) | |
| Appellant, ) | |
| ) | |
| v.                             ) | **MEMORANDUM**[*] |
| ) | |
| ANDRA SACHS; ASHBY ENTERPRISES,) | |
| INC.; MAX-SINGER PARTNERSHIP,  ) | |
| ) | |
| Appellees. ) | |
| _____ ) | |

Argued and Submitted on September 18, 2014
at Pasadena, California

Filed – October 1, 2014

Appeal from the United States  Bankruptcy Court
for the Central District of California

Honorable Robert N. Kwan, Bankruptcy Judge, Presiding

Appearances:     David R. Weinstein of Weinstein Law Firm APC
argued for appellant Carolyn A. Dye, Liquidating
Trustee; Gerald M. Serlin of Benedon & Serlin LLP
argued for appellees Myles Sachs,[**] Ashby

---

[*]This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8013-1.

[**]On February 10 2014, after this appeal was fully briefed, Counsel for the appellees filed a notice of suggestion of death

continue...

Enterprises, Inc. and Max-Singer Partnership.

Before: KURTZ, DAVIS[***] and KIRSCHER, Bankruptcy Judges.

## INTRODUCTION

Flashcom Inc.'s chapter 11[1] liquidating trustee Carolyn A. Dye appeals from an order denying in part her motion for entry of a $9 million stipulated judgment. Dye asserted that she was entitled to entry of the judgment against Andra Sachs and the other appellees in accordance with a "buyout option" in the parties' settlement agreement. Dye claimed that, under the buyout option, Sachs was granted the option of either paying $62,500 or having entered against her and the other appellees the $9 million stipulated judgment. Because Sachs did not timely pay the $62,500 buyout option amount, Dye contended that she was

[**]...continue
of Andra Sachs. On September 15, 2014, the Orange County Superior court appointed Myles Sachs as the Special Administrator for purposes of representing the decedent's estate at oral argument in this appeal. Based on the Superior Court appointment, Myles Sachs filed a motion seeking to substitute into this appeal as a party in place of Andra Sachs. Because the Superior Court appointment expired by its own terms as of the close of business on the date of oral argument, Myles Sachs' motion is ORDER DENIED, except to the extent of permitting him to represent the decedent's estate at the September 18, 2014 oral argument.

[***]The Honorable Laurel E. Davis, Bankruptcy Judge for the District of Nevada, sitting by designation.

[1]Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037. All "Civil Rule" references are to the Federal Rules of Civil Procedure, and all "Evidence Rule" references are to the Federal Rules of Evidence.

2

entitled to enter and enforce the $9 million stipulated judgment.

The bankruptcy court determined that, under California law, the buyout option constituted an unenforceable penalty. We agree with that determination. We further hold that the bankruptcy court had inherent authority to modify the court-approved settlement agreement to limit the amount of the stipulated judgment to the amount of damages Dye actually suffered as a result of Sachs' nonpayment of the $62,500. On this record, the bankruptcy court correctly exercised that authority.

However, the bankruptcy court misconstrued California law when it excluded from the $62,500 judgment prejudgment interest on and after April 1, 2012. This limited aspect of the court's decision must be vacated, and the matter must be remanded so that the court can amend the judgment to provide for prejudgment interest up to the date of entry of the judgment.

Accordingly, we AFFIRM IN PART, VACATE IN PART, AND REMAND WITH INSTRUCTIONS.

## FACTS

Andra and her husband Brad[2] founded Flashcom, an internet service provider, in 1998. Initially, the Sachses were Flashcom's only shareholders. However, in June 1999, the Sachses relinquished their sole ownership and control of Flashcom when they agreed to sell shares of Flashcom preferred stock to certain venture capital companies.

In February 2000, Andra and Flashcom reached an agreement

---

[2] We refer to the Sachses by their first names for ease of reference. No disrespect is intended.

3

pursuant to which Flashcom redeemed a substantial portion of Andra's Flashcom shares in exchange for $9 million. Flashcom paid the $9 million to Andra by wire transfer on February 23, 2000.

Later that same year, in December 2000, Flashcom commenced a chapter 11 bankruptcy case in the Central District of California and, roughly a year later, confirmed a chapter 11 liquidating plan. Under the plan, Dye was appointed to serve as liquidating trustee.

In July 2002, Dye filed a complaint against Brad, Andra, the venture capital companies holding Flashcom shares, and others. The complaint stated several different claims for relief. Some of them were resolved by summary judgment motions, while others were resolved after trial. And yet others were resolved, at least in part, by means of the settlement from which this appeal arose. The two claims relevant to the settlement and this appeal are Dye's third and fourth claims for relief seeking to avoid and recover as a preference the $9 million stock redemption in favor of Andra.

Meanwhile, also in July 2002, Brad filed a personal chapter 7 bankruptcy case in the Southern District of Florida, and Robert Furr was appointed to serve as the chapter 7 trustee in that case. Furr initiated his own litigation against Andra and her affiliated companies (collectively, "Andra Parties").

On November 1, 2005, the California bankruptcy court entered an order pursuant to Rule 9019(a) approving the settlement between Furr, Dye and the Andra Parties. On June 14, 2006, the Florida bankruptcy court entered a similar settlement approval

4

order.

The settlement, referred to as the "Global Settlement Agreement," was global in the sense that it addressed and resolved the litigation then pending between Furr, Dye, and the Andra Parties.  On the other hand, the settlement was not global as it did not fully dispose of all of the claims as against all of the defendants in Dye's adversary proceeding.

The settlement provided for Andra to pay Furr $500,000 on the "Approval Date" (as defined in the agreement) and another $250,000 within six months of the Approval Date.[3]

In addition to these payments, Andra agreed to sign two stipulated judgments, one known as the "Dye Avoidance Judgment" and the other known as the "Dye Liability Judgment."  The Dye Avoidance Judgment declared that the $9 million wire transfer paid to Andra was avoided as a preferential transfer under § 547(b).  The Dye Liability Judgment provided pursuant to § 550(a) for the joint and several liability of the Andra Parties for the $9 million preferential transfer.

The settlement provided for the immediate entry of the Dye Avoidance Judgment but did not permit Dye to immediately record the Dye Avoidance Judgment or to take any immediate action with respect to the Dye Liability Judgment.  Rather, both stipulated judgments were subject to Andra's right to exercise what was

_____

[3]While these payments were directly payable to Furr, they also stood to benefit Flashcom's creditors.  Post-settlement, Dye expected to be by far the largest creditor of Brad's bankruptcy estate, so the lion's share of any distribution from Brad's bankruptcy estate ultimately was expected to end up in Dye's hands for the benefit of Flashcom's creditors.

5

known as the "Dye Buyout Option" as described in paragraphs 9 and 10 of the settlement. In essence, if Andra timely paid the amount specified in the Dye Buyout Option, such payment would satisfy any and all liability of the Andra Parties to Dye and the Flashcom bankruptcy estate. If Andra did not timely pay the Dye Buyout Option amount, then Dye was entitled to record the Dye Avoidance Judgment and to take all action necessary to enforce the Dye Liability Judgment.

The timing and amount of the payment due under the Dye Buyout Option were governed by two complex paragraphs, which stated as follows:

> 10. Dye Buyout Option.
>
> a. The payment due under the Dye Buyout Option shall be $50,000 if, within 36 months of the Approval Date, Dye receives at least $2,000,000 from the [non-settling] defendants in the in the [sic] Dye v. Andra Adversary Proceeding . . . (collectively, "Other Defendants"). Such $50,000 payment shall be due within 60 days after Dye receives, and notifies Andra that she has received, at least $2,000,000 from the Other Defendants.
>
> b. The payment due under the Dye Buyout Option shall be $62,500 if Dye's recovery against the Other Defendants in the Dye v. Andra Adversary Proceeding within 36 months of the Approval Date is less than $2,000,000 (including if there is no such recovery at all). Such $62,500 payment shall be due within the earlier of (i) the end of the 37th month after the Approval Date or (ii) such time as there is a final resolution of the Dye v. Andra Adversary Proceeding by entry of a judgment or an order approving a settlement agreement.

Global Settlement Agreement at ¶ 10.

As for the Approval Date, the settlement agreement defines it as:

> [T]he first business day following the tenth day after the entry of the later of the two orders of the respective Bankruptcy Courts approving this Agreement,

6

so long as no stay of either of those orders has been entered prior to that date, provided that an irrevocable escrow of $500,000 has been made with Shulman Hodges & Bastian LLP (the "Escrow Agent") prior to the hearing on the settlement by Andra. . . . If such a stay is entered, the Approval Date will be the first business day after the stay is dissolved or otherwise becomes ineffective, as long as the Agreement has not been materially changed by a court in the interim. If such a change has occurred, proceedings upon this Agreement will be determined in accordance with that ruling.

Id. at ¶ 2.

In a vacuum, and without the benefit of knowing (as we do) what actually transpired, these paragraphs were nebulous at best and nonsensical at worst. Nonetheless, the critical dates for the Dye Buyout Option were not overwhelmingly difficult to calculate in light of the events that actually transpired – events that all could have been ascertained by monitoring the dockets in the relevant bankruptcy cases and adversary proceeding. The following is a summary of the key events and the critical dates they generated.

- First, the Approval Date was June 26, 2006 (the first business day following ten days after the Florida bankruptcy court's June 14, 2006 approval of the settlement).

- Second, the deadline for fixing the amount of the Dye Buyout Option payment was June 26, 2009 (36 months following the Approval date).

- Third, by June 26, 2009, Dye had not obtained either any settlement with or any judgment against the non-settling defendants; such a settlement or judgment would have been a prerequisite to any recovery along the lines contemplated in subparagraph 10(a) of the settlement agreement.

7

- Fourth, given the absence of the requisite recovery of at least $2 million by June 26, 2009, the timing and amount of the Dye Buyout Option payment were controlled by subparagraph 10(b) of the settlement agreement.

- And fifth, under the events as they transpired, subparagraph 10(b) required payment of $62,500 by no later than July 31, 2009 (the end of the 37th month following the approval date).

See Stipulation of Facts (June 21, 2012) at ¶¶ 5, 9-10.

In 2006, Andra timely paid $750,000 to Furr in accordance with the terms of the settlement agreement. However, Andra did not timely make the Dye Buyout Option payment.

Dye did not demand payment, serve any notice, or otherwise communicate with any of the Andra Parties in July 2009 or thereafter, until January 2012, when Dye's counsel, David Weinstein, contacted the Andra Parties' former counsel, James Bastian, and informed him of Dye's contention that the Andra Parties were liable for the full $9 million in accordance with the settlement agreement and the stipulated judgments. In response, Bastian advised Weinstein that he no longer represented the Andra Parties.

In March 2012, Dye filed a motion requesting that the California bankruptcy court enter the Dye Liability Judgment against the Andra Parties based on Andra's failure to make the Dye Buyout Option payment. After receiving her service copy of the motion, Andra more than once offered to pay $62,500 in satisfaction of her obligations under the settlement agreement, but Dye declined these offers based on her contention that the

8

Andra Parties were liable for the full $9 million.

For the next year, the parties litigated the issue of whether Dye was entitled to entry of the $9 million judgment. The parties filed numerous briefs, declarations, exhibits and evidentiary objections. Among other things, Andra argued that the $9 million stipulated judgment constituted an unenforceable penalty under California law. Andra also argued that she was entitled to equitable relief from the court-approved settlement and the stipulated judgments. To paraphrase Andra, the following facts and circumstances justified equitable relief:

• Andra timely paid $750,000 of the approximately $800,000 in agreed-upon settlement payments.

• Andra was ready, willing and able to pay the final remaining $50,000 or $62,500 settlement installment on the settlement's Approval Date, but Dye insisted on a deferred final payment at some future date to be determined in accordance with the complex formula set forth in the settlement; Dye refused to permit Andra to make the final payment on or around the Approval Date.

• Weinstein told Bastian during settlement negotiations that Dye did not intend/expect[4] to enforce a $9 million judgment

[4]This was one of the few factual disputes between the parties. Dye insisted that Weinstein never used the word "intend" but rather merely said that Dye did not "expect" that she ever would be in a position to enforce the $9 million judgment because she expected Andra to exercise the Dye Buyout Option. Regardless, it is plain from the record that no one – not the bankruptcy court and certainly neither of the parties – thought at the time of settlement that the $9 million judgment ever would be entered or enforced. The implications of this lack

continue...

9

against the Andra Parties but instead sought to use the settlement agreement and the stipulated judgments as a means of advancing Dye's claims against the non-settling defendants.

- Once the settlement had been approved, Dye filed a series of motions against the non-settling defendants predicated upon the Andra Parties' admissions set forth in the settlement agreement and the stipulated judgments.

- The Dye Buyout Option provisions in the settlement agreement, which governed the payment of the final $50,000 or $62,500 settlement installment were confusing and did not identify a specific future date for payment, but rather required the Andra Parties to calculate the future payment date by ascertaining and considering a number of different factors and variables.

- Dye never apprised the Andra Parties of the status of the remainder of her adversary proceeding against the non-settling parties, which was one of the variables for determining the amount and timing of the Dye Buyout Option payment.

- Dye never demanded payment of the $62,500 at the time when Dye claims it was due, nor at any point for two and a half years thereafter.

- In March 2012 and thereafter, Dye refused Andra's repeated offer to pay the final $62,500.

---

[4]...continue
of expectation and reliance regarding the $9 million judgment is discussed <u>infra.</u>

10

• Dye admitted that, when the settlement agreement was entered into, she had no expectation of entering or enforcing the Dye Liability Judgment.

The bankruptcy court advised the Andra parties at one of the hearings that, if they wanted the court to consider granting equitable relief from the court-approved settlements, they would need to file a formal motion seeking that relief under Civil Rule 60(b). The Andra Parties thereafter filed a motion framing their pre-existing request for equitable relief within the rubric of Civil Rule 60(b)(6).

The court held a number of hearings and ultimately issued two separate memorandum decisions, the latter of which it subsequently amended.

In the first memorandum decision, the bankruptcy court determined that, although California law was not binding, the court could consider California law on liquidated damages in addressing the Andra Parties' request for equitable relief. The court also determined that the Dye Buyout Option was an unenforceable penalty under Cal. Civ. Code § 1671(b). The court further determined that, based on all of the circumstances presented, Civil Rule 60(b) was a timely and appropriate means for addressing the Andra Parties' request for equitable relief. Based on these determinations, and on all of the circumstances, the bankruptcy court held that the Andra Parties were entitled to equitable relief and that Dye only was entitled to entry of a stipulated judgment in the amount of $62,500 plus interest.

In its supplemental memorandum decision, as amended, the bankruptcy court elaborated on the particular circumstances that

11

led it to conclude that it would be inequitable to permit Dye to enter and enforce the $9 million judgment. The key facts and circumstances posited by the Andra Parties were largely uncontroverted, and the court essentially adopted virtually all of those facts and circumstances as part of its own findings.

But the bankruptcy court's findings went even further than the Andra Parties' factual recitations. The court inferred from the contents of the settlement agreement and from both parties' accounts of what they said, did and thought during the negotiation of the settlement agreement that Dye and Weinstein intentionally structured the settlement, the Dye Buyout Option and the stipulated judgments to set up the Andra Parties for failure. The court explained that Weinstein knew from his settlement discussions with Bastian that Bastian planned to discontinue his representation of Andra soon after the settlement agreement was approved and that Andra likely would be unrepresented after that point and likely would be left trying to figure out for herself the complex provisions of the Dye Buyout Option.

The following comments of the court are representative of the court's findings:

> These perverse circumstances at best represented a "perfect storm" that [the Andra Parties] are liable for a judgment 10 times more than what they settled for (or 144 times what remained due), which was in violation of applicable state contract law as an unreasonable and unenforceable penalty, or at worst, a "trap for the unwary" set by [Dye] and her counsel, who intentionally insisted that the settlement agreement provide for no notice to [the Andra Parties] of the last settlement payment when it became due and who expected that [the Andra Parties were] not likely to [be] represented by counsel . . . after the settlement was approved. The court can discern no rational basis for the complicated

12

settlement payment structure of the Dye Buyout Option of the Global Settlement Agreement, inconsistent notice provisions, and Trustee's failure to give any notice of the amount due [once] the amount was fixed other than to trap the unwary [Andra Parties] into paying the full judgment amount. There is no other legitimate collection purpose for the so-called Dye Buyout Option because [the Andra Parties] wanted to make an early payment of the full settlement amount as evidenced by their payment of $750,000 of the either $800,000 or $812,500, over 90% of the settlement amount due, and based on Andra Sachs' uncontroverted statements in her declarations [that she was] ready, willing and able to pay the balance when [she] entered into the settlement in 2005.

Amd. Supp. Mem. Dec. (June 24, 2013) at 22:14-23:3.

Based on the bankruptcy court's two memorandum decisions, it entered an order which partially granted Dye's motion, but only to the extent of providing for the entry of the Dye Liability Judgment in the amount of $62,500 plus interest. The court thereafter entered the $62,500 judgment. In that judgment, the court cut off the accrual of prejudgment interest as of April 1, 2012. According to the court, Andra's offer to pay $62,500 as of that date was sufficient to relieve the Andra Parties of any further liability for prejudgment interest.

Dye timely appealed.

**JURISDICTION**

The bankruptcy court had jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(F), and we have jurisdiction under 28 U.S.C. § 158.

**ISSUES**

1. Did the bankruptcy court commit reversible error when it granted equitable relief to the Andra Parties and modified the terms of the parties' court-approved settlement agreement to limit Dye to a stipulated judgment in the amount of $62,500 plus

13

interest?

2. Did the bankruptcy court commit reversible error when it cut off the accrual of prejudgment interest on the $62,500 as of April 1, 2012?

**STANDARDS OF REVIEW**

We review the bankruptcy court's grant of equitable relief for an abuse of discretion. See Zurich Am. Ins. Co. v. Int'l Fibercom, Inc. (In re Int'l Fibercom, Inc.), 503 F.3d 933, 939, 945 (9th Cir. 2007).

A bankruptcy court abuses its discretion when it applies an incorrect legal rule, or when the factual findings supporting its decision are illogical, implausible or without support in inferences that may be drawn from facts in the record. United States v. Hinkson, 585 F.3d 1247, 1261-62 & n. 21 (9th Cir. 2009) (en banc).

The issue concerning the accrual of prejudgment interest turns upon the effectiveness of Andra's tender of the $62,500. This question, in turn, required the bankruptcy court to construe state law, which construction we review de novo. See Trishan Air, Inc. v. Fed. Ins. Co., 635 F.3d 422, 426-27 (9th Cir. 2011).

We can affirm on any ground supported by the record. Thompson v. Paul, 547 F.3d 1055, 1058-59 (9th Cir. 2008).

**DISCUSSION**

Dye contends on appeal that the bankruptcy court's decision contravened binding Ninth Circuit authority. Relying on Twentieth Century-Fox Film Corp. v. Dunnahoo, 637 F.2d 1338 (9th Cir. 1981), Dye argues that the bankruptcy court erred in two distinct ways. According to Dye, the court should not have

14

considered state contract law principles in the process of granting relief to the Andra Parties and also should not have permitted the Andra Parties to request that relief roughly seven years after the court entered an order approving the parties' settlement agreement.

Dunnahoo is inapposite. Dunnahoo involved an entered consent judgment and the efforts of one of the parties to the consent judgment to enforce it as entered. Here, Dye was seeking to enforce a court-approved settlement agreement and to cause the bankruptcy court, in accordance with the settlement agreement, to enter a stipulated judgment signed by the adverse party (Andra) but not previously entered. Because the stipulated judgment at issue – the Dye Liability Judgment – was not previously entered, it was not final, and hence neither Dunnahoo nor Civil Rule 60(b) were applicable to the Dye Liability Judgment. See Civil Rule 60(b) (stating that this Civil Rule applies to "final" judgments, orders and proceedings).

A different Ninth Circuit case, one that neither of the parties cited, is more helpful to us in resolving this appeal. See A & A Sign Co. v. Maughan, 419 F.2d 1152 (9th Cir. 1969), cited with approval in Meyer v. Lenox (In re Lenox), 902 F.2d 737, 740 (9th Cir. 1990).

In Maughan, A & A Sign Co. performed some construction work for the debtor prior to the debtor's bankruptcy filing and claimed a materialmen's lien under Arizona law after the debtor filed bankruptcy. Subsequent settlement negotiations between the bankruptcy trustee and A & A resulted in them entering into a compromise stipulation pursuant to section 27 of the Bankruptcy

15

Act (11 U.S.C. § 50),[5] which stipulation was approved by the district court. 419 F.2d at 1154.

The stipulation effectively provided: (1) that A & A held a duly-perfected materialmen's lien under Arizona law; (2) that the lien secured the reasonable value of the services and materials furnished by A & A, less a specified sum paid in exchange for A & A's release of its lien against one of three parcels of real property; and (3) that A & A continued to hold a valid and enforceable materialmen's lien against the other two parcels of real property in the approximate amount of $14,000. Id.

Several months after the compromise stipulation was approved by the district court, the bankruptcy trustee filed a motion seeking to modify the compromise stipulation. According to the trustee, he had not intended in entering into the stipulation to permit A & A to retain its lien as against both parcels of real property and the language in the stipulation permitting A & A to retain its lien as against both parcels was inadvertent on the part of the trustee. A & A opposed the motion and presented contrary evidence indicating that its retention of the lien as against both parcels was a critical term of the stipulation that it bargained for. Id. at 1154-55.

The district court granted the trustee's motion, but the Ninth Circuit reversed because, on the record presented, there was no evidence or legal basis that would permit the bankruptcy

---

[5]11 U.S.C. § 50 was similar to current Rule 9019 and provided in relevant part that a bankruptcy trustee "may, with the approval of the court, compromise any controversy arising in the administration of the estate upon such terms as he may deem for the best interest of the estate."

16

court to excise one term of the compromise stipulation over the objection of one of the parties but leave the remainder of the compromise stipulation in tact. Id. at 1155-56. Even though the Ninth Circuit reversed, the Ninth Circuit held in relevant part that bankruptcy courts have the inherent equitable power to modify their prior orders, including orders approving compromise stipulations. Id. at 1155. The Ninth Circuit further opined that the district court's modification of the compromise stipulation could have been sustained over A & A's objection "had there been findings supported by substantial evidence warranting reformation of the stipulation." Id. at 1156.

In short, Maughan stands for the proposition that bankruptcy courts have inherent equitable authority to modify or vacate compromise stipulations if circumstances so justify. Maughan further stands for the proposition that basic contract law principles – like contract reformation – are relevant and can be considered.

Maughan is binding Ninth Circuit law. It has not been overruled or superseded by statute. Moreover, In re Lenox, cited above, indicates that Maughan's teachings continue to be vital, relevant and valid today. Given the similarity between the compromise provision contained in section 27 of the Bankruptcy Act and Rule 9019, which currently governs compromises in bankruptcy cases, we know of no reason why we are not bound to follow Maughan.

Only one small aspect of Maughan appears outdated. Maughan indicated that orders approving compromises are interlocutory orders, whereas under the "pragmatic approach" to the finality of

17

bankruptcy court orders, orders approving compromises are now treated as final orders for appeal purposes. See Expeditors Int'l v. Citicorp N. Am. (In re Colortran), 218 B.R. 507, 510 (9th Cir. BAP 1997). Nonetheless, decisions following Maughan and In re Lenox have established that the bankruptcy court's inherent authority to modify and vacate its prior orders exists even when such orders are final. See, e.g., In re Int'l Fibercom, Inc., 503 F.3d at 945; Heritage Pac. Fin., LLC v. Montano (In re Montano), 501 B.R. 96, 114 n.15 (9th Cir. BAP 2013); see also In re Lenox, 902 F.2d at 740 ("although [Civil Rule] 60(b) refers to relief from final orders, it does not restrict the bankruptcy court's power to reconsider any of its previous orders when equity so requires.").

The Ninth Circuit only has identified one general limitation on the bankruptcy court's inherent authority to modify, vacate or reconsider its prior orders. The bankruptcy court only may do so to the extent that no intervening rights have vested in reliance thereon. See In re Lenox, 902 F.2d at 739-40 (citing Chinichian v. Campolongo (In re Chinichian), 784 F.2d 1440, 1443 (9th Cir. 1986)). In In re Int'l Fibercom, Inc., the Ninth Circuit refined this vested rights limitation. 503 F.3d at 944-45. The Ninth Circuit there ruled that, so long as the objecting party has not detrimentally relied on the aspect of the order that is being subjected to clarification or modification, the bankruptcy court can exercise its equitable powers. Id.

Here, we have found no evidence in the record that Dye detrimentally relied on the Dye Buyout Option provisions purporting to entitle her to enter the $9 million judgment. In

18

fact, Dye admitted that, at the time she entered into the settlement agreement, she never expected to be able to enter or enforce the $9 million judgment. Moreover, the only action that Dye apparently has taken in furtherance of her purported entitlement to the $9 million judgment is the litigation she has initiated seeking to enter the judgment. However, assuming a particular litigation position based on the provision in question does not constitute the type of reliance or "vested rights" that would preclude the bankruptcy court from exercising its inherent authority. See, e.g., In re Lenox, 902 F.2d at 739 (no preclusive reliance where creditor opposed plan confirmation and appealed therefrom based on terms of prior court-approved stipulation); In re Int'l Fibercom, Inc., 503 F.3d at 937-38 (no preclusive reliance where creditor initiated relief from stay, administrative claim, summary judgment and appeal proceedings all based on agreed-upon terms set forth in the debtor's contract assumption motion, which the court previously granted by entered order).

There is one other limitation that the Ninth Circuit sometimes has recognized regarding the bankruptcy court's inherent authority to modify one of its prior orders. Ordinarily, the court cannot exercise its modification authority over the objection of the adverse party by excising one provision of the parties' stipulation but leaving the rest of the parties' stipulation in tact. Maughan, 419 F.2d at 1155; see also Stephens Institute v. N.L.R.B., 620 F.2d 720, 725-26 (9th Cir 1980)(recognizing the same rule and the same limitation in a non-bankruptcy civil case).

19

Even so, this anti-modification limitation is itself equitable in nature, and the Ninth Circuit has refused to apply it when the proponent's own inequitable conduct instigated the dispute. Stephens Institute, 620 F.2d at 725-26. On this record, and in light of the bankruptcy court's uncontested findings that Dye refused Andra's offers to pay the $50,000 or 62,500 on the Approval Date, insisted on the complex payment provisions set forth in the Dye Buyout Option, and intentionally structured these provisions in the hopes of setting up the Andra Parties for failure, Dye is in no position to invoke this anti-modification limitation. See id.

There is a separate and independent reason why the anti-modification limitation does not apply here. As indicated in Maughan, 419 F.2d at 1156, this limitation does not apply where the application of contract law principles support the modification. Here, the bankruptcy court determined under California contract law that the Dye Buyout Option was an unenforceable penalty provision. We agree. As stated by the California Supreme Court:

> A liquidated damages clause will generally be considered unreasonable, and hence unenforceable under [Cal. Civil Code] section 1671(b), if it bears no reasonable relationship to the range of actual damages that the parties could have anticipated would flow from a breach. The amount set as liquidated damages must represent the result of a reasonable endeavor by the parties to estimate a fair average compensation for any loss that may be sustained. In the absence of such relationship, a contractual clause purporting to predetermine damages must be construed as a penalty. A penalty provision operates to compel performance of an act and usually becomes effective only in the event of default upon which a forfeiture is compelled without regard to the damages sustained by the party aggrieved by the breach. The characteristic feature of a penalty is its lack of proportional relation to the damages

20

which may actually flow from failure to perform under a contract.

Ridgley v. Topa Thrift & Loan Ass'n, 17 Cal.4th 970, 977 (1998) (citations and internal quotation marks omitted).[6]

Here, there was no rational relationship between the $62,500 Dye Buyout Option payment and the $9 million judgment. When evaluating the validity of a liquidated damages clause in a settlement agreement, the appropriate measure of damages for nonpayment of the settlement amount ordinarily is tied to the amount due under the settlement agreement and not to the amount originally sought by the plaintiff in its complaint. See Greentree Fin. Grp., Inc. v. Execute Sports, Inc., 163 Cal.App.4th 495, 499-500 (2008).

There is no evidence in the record here to support Dye's implicit assertion on appeal that her original preference claim of $9 million is an appropriate measure of her damages resulting from the non-payment of the $62,500 Dye Buyout Option amount. To the contrary, Dye's compromise motion effectively represented that the payments provided for in the settlement agreement constituted a fair and reasonable recovery for Flashcom's

---

[6]While Dye has argued on appeal that the bankruptcy court should not have considered state contract law principles in the process of granting the Andra Parties' request for equitable relief, both parties seem to agree with the bankruptcy court's assessment that, to the extent state law does apply to this matter, California law governs. Because Dye has not argued that any other state's law should govern, she has waived this argument. See Christian Legal Soc'y v. Wu, 626 F.3d 483, 487–88 (9th Cir. 2010) ("We review only issues [that] are argued specifically and distinctly in a party's opening brief."); Brownfield v. City of Yakima, 612 F.3d 1140, 1149 n.4 (9th Cir. 2010) (same).

21

creditors on account of the $9 million preference claim. Moreover, Dye made this representation with the admitted expectation that she never would be in a position to enter or enforce the $9 million judgment.

Dye argues that the Dye Buyout Option was not a liquidated damages provision at all, but rather was a true option. In other words, according to Dye, the Dye Buyout Option presented the Andra Parties with two bona fide alternatives: (a) either pay $62,500, or (b) be subject to liability for a $9 million judgment. This argument lacks merit. The California Supreme Court has made it clear that, when considering whether a provision constitutes an unenforceable liquidated damages provision or a valid alternate means of performance, substance should prevail over both the form and the wording of the agreement. See Ridgley, 17 Cal.4th at 979-80. As Ridgley stated:

> We have consistently ignored form and sought out the substance of arrangements which purport to legitimate penalties and forfeitures. Looking to the substance rather than the form of the disputed provision, we agree with the superior court and the Court of Appeal dissenter that it was invalid because it was intended to, and did, operate as a penalty for late payment. However one describes its form, the intent and effect of the disputed provision here was that any late payment or other default by plaintiffs would result in a severe penalty . . . .

Id. (citations and internal quotation marks omitted).

Here, what Dye phrased as an option was nothing more than a penalty. No rational person would willingly choose the so-called "alternate performance" of liability under the $9 million judgment especially when, as here, it is undisputed that the adverse party was ready, willing and able to pay the $62,500 Dye

22

Buyout Option amount. Furthermore, it is telling that Dye sought to enforce the Dye Buyout Option precisely as a penalty – as a consequence of Andra's failure to timely pay the Dye Buyout Option amount.

Nor can Dye escape this result by referencing the fact that the parties eschewed terminology like "breach" and "damages". Dye's argument is wholly at odds with Ridgley's mandate that substance should control over the form and wording used by the parties.

Relying on Schneider v. Verizon Internet Servs., Inc., 400 F. App'x 136, 138 (9th Cir. 2010), Dye contends that the relative benefits and burdens of the alternatives must be weighed at the time the agreement is entered into. But Schneider is an unpublished decision and its facts are distinguishable. Schneider dealt with the issue of whether an early termination fee constituted a penalty or a bona fide alternative to performance. No one here has attempted to characterize the Dye Buyout Option as the equivalent of an early termination fee, nor would the record support such a characterization.

Also relying upon Schneider, Dye asserts that the only way to properly measure whether the Dye Buyout Option constitutes an unenforceable penalty is to measure the $9 million judgment against Dye's original preference claim and Andra's risk of liability thereunder. This assertion runs afoul of Greentree Fin. Grp., Inc. and our discussion of that case above, in which we concluded that there was no rational basis here for tying the consequences for non-payment of the Dye Buyout Option amount to the stated amount of Dye's preference claim.

23

Dye further points out that the Andra Parties knew and fully understood the potential risks associated with the Dye Buyout Option and that the settlement agreement was a commercial transaction entered into by sophisticated parties who at the time were both represented by counsel. This much is true. Nonetheless, the California courts have made it clear that sophisticated parties engaged in commercial transactions are not exempt from the protections afforded under Cal. Civil Code § 1671(b). See Ridgley, 17 Cal.4th at 981 n.5; Harbor Island Holdings v. Kim, 107 Cal.App.4th 790, 799 (2003).

Our decision upholding the bankruptcy court's ruling limiting Dye to a $62,500 judgment is consistent with contract reformation principles – the exact same principles referenced in Maughan, 419 F.2d at 1156. As discussed in the facts section above, at the time the settlement was entered into and approved, the parties did not expect that the Dye Liability Judgment ever would be enforced. Indeed, at that time, the express purpose and motivation underlying the Dye Liability Judgment was to use it against the non-settling defendants and not against the Andra Parties. After Dye lost her litigation against the non-settling defendants, Dye's motivation regarding how she wanted to use the Dye Liability Judgment obviously changed, and the explicit terms of the Dye Buyout Option facilitated Dye's change in motivation.

But application of contract reformation principles here would prevent Dye from successfully acting upon her changed motivation. As explained in Maughan: "[r]eformation is an appropriate remedy to correct a written instrument when the words it contains do not express the meaning the parties agreed upon

24

. . . ." Id. at 1556. See also Restatement (Second) Contracts § 155 (1981). In short, at the time of settlement, the parties never really meant for the Dye Liability Judgment ever to be enforced against the Andra Parties. Even though the settlement agreement as written appears to permit such enforcement, contract reformation principles could be invoked to conform the written instrument to the parties' actual expectations at the time of contract formation.

We acknowledge that contract reformation was not put at issue by the parties. Even so, we find the above contract reformation analysis instructive because of its role in Maughan and because it would lead to the same result as that reached by declaring the $9 million judgment an unenforceable penalty.

We also acknowledge that, at oral argument, Dye's counsel indicated that the bankruptcy court excluded some of the parties' evidence pursuant to Evidence Rule 408. But it is difficult to reconcile any such exclusion with the bankruptcy court's findings and factual statements, many of which appear to hinge on events that transpired during settlement negotiations. Regardless, Evidence Rule 408 does not impede our analysis. Dye did not address Evidence Rule 408 or the court's evidentiary exclusion rulings in her appeal briefs, so she has forfeited any issue relating thereto. See Christian Legal Soc'y, 626 F.3d at 487–88; Brownfield, 612 F.3d at 1149 n.4. More importantly, it is well established that Evidence Rule 408 does not exclude evidence related to a settlement when it is offered for the purposes of interpreting or enforcing the settlement. See Advisory Committee Notes accompanying 2006 amendments to Evidence Rule 408 (citing

25

Coakley & Williams v. Structural Concrete Equip., 973 F.2d 349, 353-54 (4th Cir. 1992)); see also Cates v. Morgan Portable Bldg. Corp., 780 F.2d 683, 691 (7th Cir. 1985) ("Obviously a settlement agreement is admissible to prove the parties' undertakings in the agreement, should it be argued that a party broke the agreement.").

Most of Dye's other arguments on appeal concern whether the bankruptcy court correctly relied upon Civil Rule 60(b) to grant the Andra Parties relief from the terms of the court-approved settlement agreement. In light of our analysis and holding that the bankruptcy court's decision can be affirmed as an appropriate exercise of the court's inherent authority under § 105(a), we need not reach Dye's Civil Rule 60(b) issues, and we decline to address them.

Somewhat unrelated to her Civil Rule 60(b) issues, Dye argues that the bankruptcy court abused its discretion by suggesting to the Andra Parties that they should file a motion pursuant to Civil Rule 60(b) seeking equitable relief from the court-approved settlement agreement. This so-called suggestion was made at a hearing on Dye's motion held on October 31, 2012. However, rather than providing legal advice to the Andra Parties regarding what they needed to do to prevail, the entirety of the hearing transcript reflects that the court and the Andra Parties' counsel were engaged in a lengthy colloquy during which one of the concerns the court raised was whether it could grant equitable relief – relief that the Andra Parties already had informally requested in their briefs in opposition to Dye's motion – in the absence of a formal motion.

26

Rather than attempting to give legal advice, the bankruptcy court appears to have been merely expressing its concern that the Andra Parties needed to present their pre-existing request for equitable relief in a procedurally proper format. In any event, even if there were some sort of error or abuse of discretion associated with the court's so-called suggestion that the Andra Parties needed to file a formal Civil Rule 60(b) motion, any such error was harmless, and we must ignore harmless error. Van Zandt v. Mbunda (In re Mbunda), 484 B.R. 344, 355 (9th Cir. BAP 2012). The bankruptcy court did not need a formal motion from the Andra Parties in order to grant them equitable relief from the court-approved settlement. Rather, under the court's inherent authority, the court sua sponte could grant such relief. See § 105(a); see also In re Lenox, 902 F.2d at 740 ("Although FRCP 60(b) provides that a court may relieve a party from a final order upon motion, it does not prohibit a bankruptcy judge from reviewing, sua sponte, a previous order.").

There is one final issue we must address. The court determined that Dye was not entitled to prejudgment interest on the $62,500 on and after April 1, 2012. According to the court, on or about that date, Andra's belated offer to make the $62,500 payment and Dye's refusal thereof cut off Dye's entitlement to prejudgment interest, per Cal. Civ. Code § 1504, which provides:

> [a]n offer of payment or other performance, duly made, though the title to the thing offered be not transferred to the creditor, stops the running of interest on the obligation, and has the same effect upon all its incidents as a performance thereof.

The bankruptcy court acknowledged that the following requirements ordinarily apply before an offer of payment can cut

27

off the accrual of interest:

> (1) full performance; (2) at a proper time and place; (3) made by the debtor or someone on her behalf; (4) to the creditor or some authorized person; (5) at a place appointed by the creditor; (6) timely; (7) unconditional; and (8) offer made in good faith.

Amd. Supp. Mem. Dec. (June 24, 2013) at 34:20-23 (citing 1 Witkin, Summary of California Law, Contracts, § 771, at pp. 861-862 (10th ed. 2005 and 2013 Supp.)).

The court further acknowledged that Andra's tender did not fully comply with these requirements. Nonetheless, the court concluded that Andra's tender was sufficient to cut off prejudgment interest because of Dye's failure to give Andra notice of when the Dye Buyout Option payment was due. The court reasoned that, under Cal. Civ. Code § 1511,[7] Dye's failure to

---

[7]Cal. Civ. Code § 1511 provides:

The want of performance of an obligation, or of an offer of performance, in whole or in part, or any delay therein, is excused by the following causes, to the extent to which they operate:

1. When such performance or offer is prevented or delayed by the act of the creditor, or by the operation of law, even though there may have been a stipulation that this shall not be an excuse; however, the parties may expressly require in a contract that the party relying on the provisions of this paragraph give written notice to the other party or parties, within a reasonable time after the occurrence of the event excusing performance, of an intention to claim an extension of time or of an intention to bring suit or of any other similar or related intent, provided the requirement of such notice is reasonable and just;

2. When it is prevented or delayed by an irresistible, superhuman cause, or by the act of public enemies of this state or of the United States, unless the parties

continue...

28

give notice excused Andra from full compliance with the tender requirements.

On appeal, Dye in essence argues that the bankruptcy court incorrectly invoked Cal. Civ. Code § 1511 to excuse Andra's full compliance with the tender requirements. We agree with Dye on this point. Dye had no duty, contractual or otherwise, to give Andra notice of the timing or amount of the Dye Buyout Option payment. California cases excusing an improper or delayed tender of performance based on the adverse party's conduct are predicated on the adverse party having some sort of unmet duty under the parties' agreement or, in the alternative, on the adverse party affirmatively acting in some way, after the agreement was entered into, to effectively prevent timely and proper tender in accordance with parties' agreement. See, e.g., Pierce v. Lukens, 144 Cal. 397, 401-02 (1904); Ninety Nine Invs., Ltd. v. Overseas Courier Serv. (Singapore) Private, Ltd., 113 Cal.App.4th 1118, 1135-36 (2003); Connolly v. Lake Cnty. Canning Co., 95 Cal.App. 768, 771-72 (1928).

Here, in contrast, it is undisputed that Dye had no duty under the settlement agreement to give Andra any notice unless Dye recovered more than $2 million from the non-settling defendants (which she did not). Nor is there anything in the

[7]...continue
have expressly agreed to the contrary; or,

3. When the debtor is induced not to make it, by any act of the creditor intended or naturally tending to have that effect, done at or before the time at which such performance or offer may be made, and not rescinded before that time.

29

record indicating that Dye ever led Andra to believe that she would give Andra notice of the timing or amount of the Dye Buyout Option payment.

The bankruptcy court's ruling suggests that it believed that the same law, circumstances and equities that permitted it to limit the consequences arising from Andra's failure to timely pay the Dye Buyout Option amount somehow also permitted the court to cut off prejudgment interest. We disagree. Dye's entitlement to prejudgment interest was governed not by the settlement agreement but instead by Cal. Civ. Code §§ 1504 and 1511, and the bankruptcy court's ability to limit this entitlement was restricted by the terms of those statutes as construed by the California courts.

Accordingly, the bankruptcy court erred when it cut off the accrual of prejudgment interest on and after April 1, 2012. We thus will vacate this limited aspect of the court's ruling and will remand with the instruction that the bankruptcy court on remand should amend its judgment to include prejudgment interest up to the date of entry of the judgment, June 24, 2013.

## CONCLUSION

For the reasons set forth above, we AFFIRM the bankruptcy court's decision, except for the court's ruling on prejudgment interest. This limited aspect of the court's decision is VACATED AND REMANDED WITH INSTRUCTIONS, as set forth above.

30